UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CIVIL ACTION NO. 05-101

MELISSA BLEDSOE, PLAINTIFF

v. **OPINION AND ORDER**

DIALYSIS CLINIC, INC., DEFENDANT

\* \* \* \* \* \* \* \* \*

Defendant, Dialysis Clinic, Inc. ("DCI") has filed a Motion for Summary Judgment, alleging that Melissa Bledsoe failed to meet her burden in making a claim for pregnancy discrimination under the Kentucky Civil Rights Act ("KCRA"). In addition, it contends that Plaintiff's claim under Title VII must be dismissed for failure to exhaust administrative remedies and its Kentucky common law claim for wrongful discharge must be dismissed as the KCRA provides the exclusive remedy for such claims. After reviewing the materials submitted to the court and the prevailing law in the Circuit, the Defendant's Motion for Summary Judgment is GRANTED and the Plaintiff's claims are DISMISSED.

### I. FACTUAL AND PROCEDURAL BACKGROUND

DCI is a non-profit corporation that provides dialysis services to patients with renal disease. The process involves taking blood from patients, running the blood through a dialysis machine that filters out any potential toxic waste products and pumping the clean blood back into the patient. DCI has a number of locations, including one in Corbin, Kentucky. The location in Corbin offers both

"chronic" and "acute" services. "Chronic" services include providing regularly scheduled dialysis to individuals, usually two to three times a week. The "acute" service is one that is outsourced to hospitals in the area for those that need dialysis on an emergency basis. The work schedule for the acute service is much more flexible and its hours more varied, due to the unpredictability of providing emergency care and the fact that DCI provides 24-hour dialysis coverage for its clients.

Plaintiff, Melissa Bledsoe, ("Bledsoe") began her employment with DCI in September, 2002, when she was hired to be a Registered Nurse in the acute unit. Her job description included coverage of two area hospitals, Baptist Regional Medical Center and Knox County Hospital, and she worked often in both facilities. When hired, Bledsoe had no training as an acute dialysis nurse, but was promised by DCI that all of the training necessary would be "on-the-job." The initial training was done by Cathy Gore, the only other registered nurse for DCI's Corbin acute unit who was both Gore's co-worker and her supervisor. Over the course of the next two years, Gore and Bledsoe staffed the Corbin acute unit, each working three days per week, 13.5 hours per day, with the two rotating each week as to who was on-call for Sundays.

In May, 2004, Plaintiff advised her supervisor and co-workers that she had become pregnant. Bledsoe claims that as soon as DCI found out about the pregnancy, she began to be harassed, most often by Tammy Gilbert, the secretary for DCI in the Corbin clinic, Carol King, the nurse manager of the dialysis program and Marianne Rutledge-Hearn, a DCI administrator. She alleges that due to this harassment, she began keeping a daily occurrence log on June 23, 2004 to document the activities.

On June 22, 2004, Bledsoe visited her obstetrician/gynecologist, Dr. Randal Owen, who placed her under work restrictions due to her pregnancy. She was told that she was to work no more

than eight hours per day, could not lift more than 30 pounds and was to avoid x-rays, chemicals and unventilated areas. The next day, Rutledge-Hearn called a mandatory meeting for Gore, Gilbert and Bledsoe, in order to discuss adjustments to their various work schedules in order to accommodate these new work requirements.

At the meeting, Rutledge-Hearn offered to alter the work schedules of Gore and Bledsoe to eight-hour work shifts in order to conform to the doctor's requirements. She said that she believed the shorter shifts would allow the plaintiff to cope with whatever side effects she might feel from the pregnancy and would be an easier schedule for her to keep during its duration. Neither Gore nor Bledsoe was interested in such a schedule and raised objections to the change. DCI consented to allowing both women to remain on the previous schedule so long as Bledsoe was able to get approval from her doctor for the continuance of the 13.5 hour shifts. When Dr. Owen revised her restrictions to allow Bledsoe to work the longer shifts, DCI agreed to keep them in place and made the determination that no changes to the working schedule were necessary.

On July 7, 2004, Bledsoe became ill at work and could not complete her shift. Gore was then called in as a replacement and was forced to finish dialyzing one of Bledsoe's patients. Based on this incident and her claim that DCI was consistently understaffed, Gore gave notice that she was resigning her employment with DCI. At that point, Bledsoe was left temporarily as the only working nurse at the Corbin acute unit. In order to remedy this situation, Gore was quickly replaced by Carol King, who then became Bledsoe's immediate supervisor.

On July 9, 2004, the impact of Gore's resignation led to another mandatory meeting between Bledsoe, Rutledge-Hearn, Gilbert and King. King discussed the difficulties that would effect DCI due to Gore's departure and asked Bledsoe to once again consider working the eight-hour shifts. As

part of this new arrangement, DCI agreed to allow Bledsoe to work "flex time," a policy where she would not be required to come into work if no patients were there to dialyze, but she may be required to stay later if she had not finished dialyzing one of her patients. She agreed to the new schedule and it was implemented after the meeting.

One week later, on July 16, 2004, another meeting was called by the DCI supervisors. During that meeting, Rutledge-Hearn, King and Gilbert gave Bledsoe a series of options to help her determine what would be the best schedule for the remainder of her pregnancy. They gave her the option of continuing her current work schedule of five eight-hour days with "flex time," working in the chronic unit for four ten-hour days per week or taking a leave of absence under the Family and Medical Leave Act ("FMLA"). DCI claims that it expressed to Bledsoe that it was important to them that if she chose to remain on the eight-hour shift in the acute unit, that she be very hesitant to use her sick leave, as their lack of staff in that area would make it very difficult to find anyone to fill in for her lost coverage. Nevertheless, Bledsoe decided to continue with her eight-hour shifts in the acute unit.

Over the course of the next week, a number of difficulties occurred between the plaintiff and her supervisors. On July 19, 2004, Bledsoe went into work at the BRMC hospital at 6:30 a.m. for her regular shift in the acute unit. At that time, Bledsoe was informed that the only patient that would need dialysis that morning was an individual who was then in surgery, and would not be ready for the treatment until the early afternoon. Bledsoe was informed that, pursuant to the "flex time" agreement, she should return home and would be called in when it was time for her work to begin. Bledsoe objected to this requirement, and instead stayed at the hospital, making it clear that she did not believe she should have to be "on call," as that was not the system under which she was hired.

Due to this mishap, Ms. King called Bledsoe and asked her to reconsider DCI's offer to transfer her temporarily to the Corbin chronic unit, where she could work more consistent hours and her schedule would be much more predictable. Bledsoe once again rejected the offer because she found the acute clinic work much more interesting and felt that she should not have to change positions from the one for which she was hired. Soon thereafter, her physician again altered her restrictions, saying that Bledsoe was only to work eight hours a day, five days a week and could not "change jobs" during the process. At that point, Rutledge-Hearn determined that she was left with no choice but to require Bledsoe to either accept a move into the chronic unit of the Corbin clinic or to go on FLMA leave, as her doctor's restrictions made it impossible for her to engage in work in the acute clinic.

On August 4, 2004, Bledsoe became ill and was unable to come into work. Carol King was then forced to cover for her and perform dialysis on Bledsoe's patient for the day. When King arrived at the Knox County Hospital to begin the dialysis, she found the dialysis machine already had the bloodlines attached to it and a "flow sheet," a document used to illustrate the physician's orders as to the specifics for the dialysis and the progress, or flow, of the procedure as it is being performed, was lying on top.

The flow sheet that King found contained a number of markings that indicated it had been filled out prior to the procedure. It indicated that the dialysate, a chemical mixture used to remove toxins from the patient's blood, had a temperature of 36 degrees, 1000 cc's of normal saline was left following the preparation of the dialyzer, check marks were present that indicated the dialyzer had passed two required tests before the procedure could begin and a line was drawn through the "total volume support" line, communicating that the patient did not need any additional saline to stabilize

her blood pressure during the procedure. The sheet also contained the date of the procedure, August 4th, and was signed by Bledsoe, even though she had not reported into work that day.

The next day, Bledsoe was asked to come to another mandatory meeting with Ms. Rutledge-Hearn to discuss her work performance, specifically whether she had filled out the "flow sheet" prior to the dialysis treatment, a violation of the procedures required by DCI. During this meeting, Bledsoe admitted having filled out the sheet on August 3rd, the day before the treatment was scheduled to begin. She said that she had done this in the past and that she had always assumed that such pre-documentation was acceptable due to the fact that her prior supervisor, Cathy Gore, had approved of the practice.[1] Rutledge-Hearn acknowledged to Bledsoe that this was a serious violation of DCI policy and that she would be forced to communicate with the company's Human Resources Director to determine what actions must be taken. After the communication took place and while waiting for DCI's ultimate decision, Rutledge-Hearn told Bledsoe that if her explanation was accepted by DCI, she would be glad to set up her employment in the chronic unit due to her pregnancy restrictions.

Soon thereafter, Dan Watson of the DCI Human Resources Department, communicated to Rutledge-Hearn that pre-documentation of medical information was an unacceptable practice for a DCI nurse. He stated that any nurse should understand that the practice was forbidden and ordered that Bledsoe be discharged. After her termination, she filed a lawsuit alleging a violation of the Kentucky Civil Rights Act, Title VII of the Civil Rights Act of 1965 and a claim under Kentucky

---

[1] In Gore's deposition, she denies having ever communicated to Bledsoe that pre-documentation of dialysis flow sheets was acceptable in the acute unit. At the time of this action however, Gore was no longer employed by DCI and Bledsoe had a new supervisor, who she does not allege approved of this practice.

common law. On January 13, 2006, Defendant made a Motion for Summary Judgment and it is this motion the Court now reviews.

## II. ANALYSIS

Bledsoe has raised a number of claims, all of which are based on her allegation that she was terminated by DCI due to her pregnancy. Bledsoe's first claim is that her termination is a violation of federal law under Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e. However, in order for a plaintiff to bring a claim under Title VII, she must first file a charge of discrimination with the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e-5; *Amtrak v. Morgan*, 536 U.S. 101 (2002). Failure to exhaust this administrative remedy requires a dismissal of the plaintiff's claim. Bledsoe has shown no evidence that such a charge has been filed and thus this claim must be dismissed.

In addition, Bledsoe cannot go forward with her common law claim for wrongful discharge due to her gender. The Kentucky Civil Rights Act provides the exclusive remedy for all claims of wrongful discharge due to gender. *See Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). When a statute declares an act unlawful and then provides a remedial process to those aggrieved, it becomes the exclusive remedy for such violations and any common law claims are forfeited to it. *Id*. The Kentucky Supreme Court has made clear that the KCRA provides the method for addressing issues of gender discrimination, and thus Bledsoe is limited to pursuing her claim via its procedures.

Thus Bledsoe's only claim that is properly before the Court is her action under the KCRA for wrongful dismissal due to her pregnancy. In its Motion for Summary Judgment, DCI alleges that Bledsoe's firing had nothing to do with her pregnancy, but rather was due to her violation of a required standard of conduct in the workplace. In deciding a Motion for Summary Judgment, the

Court shall only render such a judgment if no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because the plaintiff is the nonmoving party, all factual inferences will be assumed in favor of her and the court will only grant summary judgment if it is found that no reasonable jury could find that Bledsoe's termination was due to her pregnancy. *Id.*

The KCRA is the Kentucky version of Title VII of the Civil Rights Act and thus claims for pregnancy discrimination under it, are analyzed in the same way as those under Title VII. *Meyers v. Chapman Printing Co. Inc.*, 840 S.W.2d 814, 820 (Ky. 1992); *Ford v. GMC*, 305 F.3d 545, 553 n.3 (6th Cir. 2002). Title VII prevents discrimination "because of sex" or "on the basis of sex" and the statute is clear that any discrimination based upon the pregnant status of a woman is prohibited. 42 U.S.C. § 2000e-2(k). Thus in order for Bledsoe to survive summary judgment, she must show that her termination was based upon her pregnant status. It is not simply enough that Bledsoe show that she was fired while pregnant, but she must show that the pregnancy was the actual cause for her firing and that the decision would not have been made absent her pregnancy.

When evaluating claims of sex discrimination under Title VII such as this one, where the Plaintiff has no direct evidence of discrimination but instead must rely on circumstantial evidence, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), governs the claim. First, the plaintiff has the burden of establishing a *prima facie* case of discrimination based upon her pregnancy. *Id.* If that burden is met, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the termination that is separate and distinct from the Plaintiff's pregnancy. *Id.* If the defendant meets its burden, then the plaintiff is required to show that the defendant's proffered reason was simply a mere pretext for

unlawful discrimination and was not the actual motivating factor for the decision. *Id.*

Bledsoe claims that she was discriminated against in two primary ways. First, she claims that she was forced to attend three mandatory meetings, the purpose of which were to harass her due to her pregnant status. Second, and more importantly, she claims that she was terminated from her employment due solely to her pregnancy. Bledsoe focuses a great deal upon the first of these claims, but it is nevertheless clearly frivolous. When Bledsoe became pregnant, it caused a disruption in her normal working schedule, in part because her doctor at the time forbade her from working her normal thirteen-hour shifts. Thus, DCI was forced to create a new work schedule for Bledsoe to accommodate these restrictions. The three meetings about which Bledsoe complains were scheduled solely for the purpose of making such accommodations and each was focused on creating a working environment that satisfied Bledsoe's needs. There is no indication that the meetings were overly long and that Bledsoe was treated poorly during them. In fact, all evidence seems to suggest that the meetings were done solely for Bledsoe's benefit, and the decisions reached were favorable to her. Bledsoe has not shown any damage caused to her from the attendance of the meetings and there is no indication they had any negative effect. Thus any claim for a Title VII violation based solely upon the three meetings is clearly without merit.

Bledsoe's other claim however is of more substance. In order to prove her allegation that she was terminated due to her pregnancy, Bledsoe must first establish a *prima facie* case of discrimination. To establish a *prima facie* case of pregnancy discrimination, a plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). The first three

of these requirements are clearly present in this case. Bledsoe's pregnancy was known by DCI, her qualifications prior to the alleged incident were never in question and she was ultimately terminated from her position.

  Bledsoe is however also required to shows a nexus between her pregnancy and the termination decision. To meet this burden, Bledsoe has only come forward with two potential links to satisfy this burden. The first is the series of mandatory meetings in which her pregnancy status was discussed and the second is the proximity in time between the company's knowledge of her pregnancy status and the termination. While proximity in time is a factor to be considered, especially in cases where knowledge of the employers is in question, here this factor is of limited importance. Both parties agree that DCI was obviously aware of the pregnancy and a significant amount of time lapsed between when it first became aware of the pregnancy, May, 2004, and when Bledsoe was ultimately terminated, early August, 2004. If the termination decision were to have been made solely based on Bledsoe's pregnancy, it would be expected that it would have taken place soon after the company had knowledge of her condition. While there may be a multitude of explanations for the decision to wait almost three months before the termination, it cannot be said that this temporal component is alone, without any other evidence, support for Bledsoe in meeting her initial burden. Thus this court will focus primarily on the allegations that the series of meetings to which Bledsoe was required to attend provide evidence of a nexus between her pregnancy and termination.

  As stated above, requiring an employee to attend a series of meetings relating to her work status, does not by itself constitute a Title VII or KCRA discrimination claim. However Bledsoe argues that these meetings nevertheless provide evidence of DCI's ultimate intent to terminate her

due to her pregnancy. While there is little discrepancy between the two parties as to what occurred at these meetings, because Bledsoe is the nonmoving party, where there is any difference in the recollections, we will assume her version of the meetings is controlling. On June 23, 2004, after Bledsoe's doctor had placed her under work restrictions due to her pregnancy, including an eight-hour limitation on her work day, DCI called a mandatory meeting to discuss with Bledsoe and her co-worker Cathy Gore, how these restrictions would change the schedule going forward. Nothing in the decision to call this meeting shows an intent to harass Bledsoe. In fact, at the meeting DCI offered to work around these restrictions and change the two nurses' schedules from 13.5 hour days to eight hour days, a change with which both nurses were uncomfortable. Both nurses believed this change would affect their ability to work and were not happy with the added days that they would have to be in the clinic. Thus after Bledsoe received permission from her doctor, DCI agreed to keep in place the prior schedule. Bledsoe objects to the meeting's existence, but the meeting was inevitable, due to the fact that her doctor had changed her working schedule. The actual results of the meeting showcase a desire by the company to accommodate Bledsoe, as her ultimate desire concerning her work schedule was implemented. Thus this meeting, even assuming Bledsoe's version of the facts to be true, not only cannot be seen as harassment, but is more accurately characterized as a reasonable attempt at accommodation.

The second meeting was similar. On July 9, 2004, due to Cathy Gore's resignation from the company, DCI called a meeting to discuss the work plans for the near future. Again, the decision to call this meeting cannot be reasonably seen as harassment, but rather as an attempt by a company, faced with the loss of an employee, to accommodate its short-term needs. At this meeting, Bledsoe's new supervisor requested that the schedule be altered to eight-hour days with "flex time," an

arrangement that Bledsoe was not forced into, but rather voluntarily agreed to try. There is no allegation that any threats occurred in this meeting. Rather, both parties came to an agreement that was an attempt to balance the needs of the company following the Gore resignation and Bledsoe's pregnancy with the desires of the employees.

The third meeting between the parties occurred one week later, on July 16, 2004. Bledsoe claims that this meeting was done solely for "harassment," but any fair assessment of the proceedings suggests a completely different meaning. After agreeing just a week before to the eight-hour work day with "flex time," DCI called Bledsoe in and proceeded to give her even more options to accommodate her schedule. It offered to allow her to continue on the then current schedule, move to a schedule of ten-hour days in the chronic unit or to take a medical leave of absence under the FMLA. Thus, rather than being seen as an attempt to harass Bledsoe, an objective view of this meeting shows a desire on behalf of DCI to give her as many options as possible, including the ability to take leave and still maintain her position. At no point during this meeting does Bledsoe claim she was threatened with her job, but rather the mere existence of the meeting was deemed by her to be harassment rather than accommodation.

Thus Bledsoe's support for a nexus between her pregnancy and ultimate termination is a series of three meetings in which, even assuming Bledsoe's version of the facts, DCI took steps to accommodate her work schedule towards the varying needs of the company. Not only do these steps on their face not constitute harassment, they are actually more proactive in accommodation than Title VII and the KCRA even require. Other district courts have found that employers are not required to change the number of days a week that a pregnant employee works in order to accommodate her pregnancy status, *Spina v. Management Recruiters of O'Hare*, 764 F. Supp. 519 (N.D. Ill. 1991); do

not violate Title VII by terminating an employee who refused to work overtime in her normal position or switch to a different position that did not require overtime, *Haas v. Phoenix Data Processing*, 1990 US Dist LEXIS 3797 (N.D. Ill. 1990); and are not acting contrary to law when they offer to switch an individual to a job with less difficulty, but in so doing change her job description slightly or the type of hours that she works. *Elie v. K-Mart Corp.*, 1994 WL 50250 (E.D. La. 1994). When taken as a whole, these cases show that where, as here, an employer seeks to work with a pregnant employee to determine a work schedule that fits her medical needs, this action cannot only not be considered harassment, but represents an attempt at work accommodation that goes even above what Title VII requires.

It is clear that Bledsoe desired to work the schedule on which she was hired, completing 13.5 hour days and getting more days completely off work. However a simple unmet desire does not necessarily constitute a KCRA violation. Bledsoe's condition made the request to stay on the previous schedule impossible. Her doctor initially advised against such a schedule and on multiple occasions, she was unable to come to work, thus leaving DCI with no one to cover her crucial role in dialysis coverage. The meetings in question were attempts to try and rectify the situation and come up with a work schedule that fit the needs of Bledsoe and DCI. Bledsoe claims that they constituted "harassment" but has offered no evidence of any actual harassing conduct that took place during them. If conduct as benign as the initiation of mandatory meetings at work could, in and of themselves, justify a finding of harassment, and provide the nexus between a termination decision and a pregnancy, then it is hard to imagine any case where the *prima facie* burden would ever not be met.

Bledsoe alleges that DCI was a poorly run company and this contributed to her stress and her

inability to work her normal schedule. She claims that DCI was consistently understaffed and that over the course of her time with the company, it was impossible for workers to call in sick and that long vacations were virtually impossible. The court has no basis to dispute any of these claims. DCI's work environment may have been the cause of the resignation of Cathy Gore and it may have been the case that the company created many of its own problems due to understaffing. However that is a different question than whether Bledsoe was ultimately terminated due to her pregnancy. Whether a company makes sound business decisions, even in the ultimate determination to discharge an employee, is irrelevant to the question of whether Title VII discrimination has occurred. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 595 (6th Cir. 2003). What matters is whether a nexus exists between the decision to terminate and the employee's pregnancy. In this case, the only nexus that Bledsoe can point to is the series of meetings initiated by the company. This is simply not enough.

However even if this court were to determine that the plaintiff had met her *prima facie* burden, she still would not be able to meet the *McDonnell-Douglas* standard. DCI has offered a legitimate, non-discriminatory reason why Bledsoe was terminated, mainly that she made a serious error in filling out dialysis "flow sheets" prior to the procedure in violation of company policy and the standards of care required by the nursing profession. In order to survive summary judgment, Bledsoe must thus show that DCI's stated reason for her termination is actually a pretext for discrimination by showing that the proffered reason (1) had no basis in fact; (2) did not motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d 232, 245 (6th Cir. 2005). She can meet none of these criteria.

In order to show that DCI's stated rationale for the termination "had no basis in fact," Bledsoe would have to prove that she did not fill out the "flow sheets" prior to the procedure. Bledsoe however admits that while she did fill out parts of the papers, the information filled in were simply the "standing orders" authorized by the physician. However the evidence suggests otherwise. Bledsoe filled in information such as how much saline was left after she had prepared the machine for dialysis, authorized that she had checked the machine and that it was working prior to the procedure and confirmed that no additional saline had to be given to the patient for blood pressure reasons during the dialysis. All of these indicators on the flow sheet are required to be done either prior to, or during the dialysis procedure. Allowing any of this information to be documented prior to the dialysis goes against the procedures of DCI and of the nursing profession. Bledsoe admits that she filled in all of this information and thus cannot show that the stated rationale had "no basis in fact."

Similarly, Bledsoe has no evidence that DCI's stated rationale did not motivate its decision to terminate. Bledsoe has been able to point to no actions by DCI that indicate any intention to discriminate due to her pregnancy, or even that the company found her pregnancy a burden that it could not accommodate. Bledsoe claims that the series of three meetings with her provide proof of the company's ultimate intention to discriminate, but as discussed earlier, she can point to no comments made during the meetings to support this assertion. There is no evidence in the record that DCI demonstrated any intention of terminating Bledsoe during her pregnancy before her violation of company policy. In fact, all evidence that does exist, points to the opposite conclusion. A company that is seeking to fire one of its employees does not usually take the step of offering them the possibility of FMLA leave or a transfer to a different unit. Bledsoe has shown the court no

evidence that any of DCI's actions prior to her termination show an intent to discriminate.

Thus, with no objective evidence indicating that the stated reason for the termination has no basis in fact or was not the motivating factor for the termination, the only thing that can salvage Bledsoe's claim is if this Court could determine that the error committed by Bledsoe was insufficient to warrant termination. In making this determination, its important to remember that the Court's role is not to simply replace the company's business judgment with that of the court's. As long as any decision was made for legitimate business purposes, the question as to whether the decision was sound in hindsight is ultimately irrelevant. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 595 (6th Cir. 2003). Companies are allowed to make business decisions on all issues, including those involving personnel, that may seem puzzling to the outside observer. However the Court's role is not to determine if a decision made sense from a business perspective, but simply whether it was discriminatory.

Bledsoe argues that her termination must be discriminatory because her decision to pre-authorize various flow sheets was not a significant mistake considering the practices of the company. However, Bledsoe once again can point to no evidence that anyone else in the company ever engaged in this practice and the only deposition testimony on the subject is from her former supervisor, testifying on Bledsoe's behalf, who insists that she never told her that such practice was authorized by company policy in the acute unit. Further, even if other nurses were engaging in such a practice, a fact that Bledsoe has not shown, it still is in violation of the standards of nursing care. DCI made the decision that this was a serious violation, one that could have endangered the health of the dialysis patient and one that so grossly violated the standards of the company that it was a terminable offense. With no evidence that such known violations were ever treated differently by DCI, there

is no basis for the court to question DCI's judgment that the offense was "serious" enough to justify termination. This is especially the case considering that it occurred in the operation of dialysis, one in which the health of the patients being treated could be at stake.

In order for a plaintiff to survive summary judgment on a claim for violation of the KCRA, she must show that she was treated differently from other non-pregnant persons who were similar in their ability or non-ability to work. *See Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996). In this case, Bledsoe simply has no evidence that could justify such a finding. All the evidence in the case points to the fact that her termination was justified due to her violation of company policy by pre-authorizing the flow sheets of dialysis patients. When an individual is terminated due to her unsatisfactory job performance, the termination is not actionable simply because it took place during the individual's pregnancy. *See e.g., Tseteranos v. Tech Prototype, Inc.* 893 F.Supp. 109 (D. N.H. 1995); *Mazella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D. N.Y. 1986). Bledsoe can point to no evidence suggesting that the termination was not justified or that the violation was not serious. More importantly, she cannot provide any evidence that DCI had in any way shown a desire to discriminate against her after it found out about her pregnancy. Rather, the only evidence in the record is that DCI attempted to accommodate her needs during the pregnancy, evidence that Bledsoe cannot refute.

It is a rare case when this Court grants summary judgment on claims of discrimination due to the pregnant status of a worker. However, if the Court were not to grant it in this case, it would essentially be holding that an individual can proceed past summary judgment and can meet the *McDonnell-Douglas* standard by simply alleging that because she was fired while pregnant, the pregnancy must have been the motivation for the action. Allowing such a claim to go forward would

make the *McDonnell-Douglas* standard meaningless and would set the precedent that all pregnancy discrimination claims survive summary judgment. This the Court cannot do. Thus, the Defendant's Motion for Summary Judgment is GRANTED and the Plaintiff's claims are DISMISSED.

All pending motions and deadlines are hereby set aside and this action shall be stricken from the Court's active docket.

This the 19th day of June, 2006.

Signed By:
*Karen K. Caldwell*
United States District Judge